O

JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DIRECTV, a Delaware corporation, | ) ) ) | Case No. CV 14-08673 DDP (x) |
| Plaintiff, | ) ) | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | ) ) | |
| FACTORY MUTUAL INSURANCE COMPANY, a Rhode Island corporation, | ) ) ) ) | [Dkt. 31] |
| Defendants. | ) ) | |

   Presently before the court is Defendant Factory Mutual Insurance Company ("Factory Mutual")'s Motion to Dismiss.  Having considered the submissions of the parties and heard oral argument, the court grants the motion and adopts the following Order.

**I.   Background**

   Plaintiff DIRECTV distributes digital entertainment programming, primarily via satellite, to residential and commercial subscribers.  DIRECTV satellite dishes pick up signals from satellites and transmit those signals to a DIRECTV Receiver (also known as a "set-top box" or "STB"), which in turn transmits the signals to the subscriber's television.

As of October 2011, DIRECTV contracted with four companies to manufacture and supply its STBs: (1) Technicolor Connected Home USA, LLC; (2) Pace Americas Inc.; (3) Samsung Electronics America, Inc.; and (4) Humax USA, Inc. These four STB manufacturers purchased the component parts and incorporated them into the finished STBs, placing the "DIRECTV" logo and trademark on the STBs they manufactured. The four STB manufacturers then sold the finished STBs to DIRECTV.

Some STBs include, as a component part, hard disk drives ("HDDs" or "hard drives"). In October 2011, all four of the STB manufacturers used HDDs made by one of two companies, Western Digital Technologies, Inc. ("Western Digital") and Seagate Technology LLC ("Seagate"). Western Digital also sold hard drives to Jabil Global Services, a third-party repair service provider that would fix defective STBs for DIRECTV.

DIRECTV categorizes the STB manufacturers as its "Tier 1" suppliers and Western Digital and Seagate as its "Tier 2" suppliers. Although DIRECTV shared pricing and technical specification requirements with Seagate and Western Digital and instructed its STB manufacturers to use only certain Seagate and Western Digital products, DIRECTV did not, during the relevant time periods, purchase any hard drives from Seagate or Western Digital or otherwise contract with either HDD manufacturer.

During the relevant time period, DIRECTV had a property insurance policy provided by Factory Mutual. The policy provided coverage for both property damage and time element, or business interruption, losses. A "contingent time element" provision of the policy extended coverage, including business interruption and extra

2

expense coverage, beyond DIRECTV's own property to certain "contingent time element locations." The policy's definition of such locations included any location "of a direct supplier, contract manufacturer or contract service provider to [DIRECTV]."

In October 2011, monsoonal flooding in northern Thailand damaged two of Western Digital's hard drive manufacturing facilities located there. Although the flooding did not affect any of the four STB manufacturers' facilities, DIRECTV alleges that the damage to the Western Digital facilities reduced the supply of hard drives available for incorporation into DIRECTV's STBs. DIRECTV further claims that the resulting price increase in Western Digital HDDs, as well as the expense of obtaining substitute HDDs from Seagate, caused DIRECTV approximately $22 million in losses and extra expenses.

DIRECTV made a claim under the Factory Mutual policy for contingent time element losses. In December 2013, after a series of communications between the parties regarding DIRECTV's supply chain and relationship with Western Digital, Factory Mutual denied the claim on the basis that Western Digital is not DIRECTV's "direct supplier," and therefore does not fall within the ambit of the contingent time element location provision. DIRECTV's position is that, despite the lack of any contractual relationship between DIRECTV and Western Digital, the latter is nevertheless a "direct supplier" by dint of the direct working relationship between the two. DIRECTV's Complaint, first filed in state court, alleges breach of contract and seeks declaratory relief. Factory Mutual removed to this court and now moves for summary judgment.

**II. Legal Standard**

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 242 (1986). If the moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate that "there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 323.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a

whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

It is not the court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1278 (9th Cir.1996). Counsel has an obligation to lay out their support clearly. Carmen v. San Francisco Sch. Dist., 237 F.3d 1026, 1031 (9th Cir.2001). The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposition papers with adequate references so that it could conveniently be found." Id.

**III. Discussion**

The only question before the court is whether the terms "direct supplier, contract manufacturer or contract service provider" are applicable to the relationship between Western Digital and DIRECTV. Such policy interpretations are matters of law, amendable, in the absence of disputed material facts, to summary judgment. See, e.g. Grange Ins. Assoc. v. Linott, 77 F.Supp.3d 926, 933 (N.D. Cal. 2015). Under California law, insurance policies are governed by the same general rules that apply to any contract interpretation. Bank of the W. v. Superior Court, 2 Cal.4th 1254, 1265 (1992); MacKinnon v. Truck Ins. Exch., 31 Cal.4th 635 (2003).

Under these rules, "the mutual intention of the parties at the time the contract is formed governs interpretation," and this intent "is to be inferred, if possible, solely from the written provisions of the contract." Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co., 5 Cal. 4th 854, 867 (1993) (citing Cal.

1  Civ. Code §§ 1636, 1639); Grange, 77 F.Supp.3d at 934. "The clear
2  and explicit meaning of these provisions, interpreted in their
3  ordinary and popular sense" governs judicial interpretation of the
4  contract unless the terms are "used by the parties in a technical
5  sense or a special meaning is given to them by usage." Bay Cities,
6  5 Cal. 4th at 867 (quotations omitted); see also Cal. Civ. Code §§
7  1639, 1644, 1638. Within these limits, however, an insurance
8  contract's language must be construed "in the context of that
9  instrument as a whole, and in the circumstances of that case . . .
10 ." Id. Moreover, "[i]n an insurance policy, coverage provisions
11 are interpreted broadly so as to afford the greatest possible
12 protection to the insured, whereas exclusionary clauses are
13 interpreted narrowly." Amerigraphics, Inc. v. Mercury Cas. Co.,
14 182 Cal. App. 4th 1538, 1551 (2010).

15     DIRECTV argues first that the phrase "direct supplier" should
16 be defined according to its usage in the "electronics supply chain
17 industry" based on the context of the Policy and the parties' usage
18 of the phrase. DIRECTV points to no evidence, however, that the
19 parties intended "direct supplier" to have some technical or
20 industry-specific definition, nor any usage of that phrase either
21 within or outside the policy itself in a manner that would suggest
22 a definition other than the ordinary and popular one. The policy
23 does include specialized definitions of otherwise ordinary terms,
24 including "location," "occurrence," "wind," "earth movement,"
25 "flood," "terrorism," "contamination," "normal," and "Great
26 Britain," as well as definitions of less common phrases, such as
27 "soft costs." The fact that "direct supplier," in contrast, is not
28

defined anywhere in the policy suggests that the parties did not intend the term to carry any technical or specialized meaning.

Rather than identify evidence of definition or technical usage, DIRECTV contends that "insurers are presumed to know and be bound by the meaning of the terms used in their insureds' industries." (Opp. at 11-12.) The authorities that DIRECTV cites in support of this principle are of little help. In Guipre v. Kurt Hitke & Co., Inc., 109 Cal. App. 2d 7, 14 (1952) and Hazard's Administrator v. New England Marine Insurance Co., 33 U.S. 557, 583 (1834), the courts did not hold that the insurers were "bound by the meaning of the terms used in their insureds' industries," but rather that the insurers were bound by the technical meaning of terms used in their own insurance industry or market. In Guipre, the court held that, because the defendant insurance agent was in the business of insuring automobiles, he was deemed to have contracted in reference to the usages and practices in that trade, particularly the practice of oral ratification of insurance coverage. Guipre, 109 Cal. App. 2d at 14-15.

In Hazard's Administrator, a ship owner seeking insurance represented in a letter sent from New York to Boston that his ship was "one of the strongest and best ships in the whale fishery [and] has been newly coppered . . . ." Hazard's Administrator, 33 U.S. at 579. The ship and its owner were both in New York, but the insurer issued the policy from its location in Boston. Id. at 580. Although the Court stated that the Boston underwriters, given their experience in the marine insurance business, must have known that ship-related definitions differ from port to port, and therefore "must have considered the ship to be described according to the New

7

York usage" of the term "coppered," it did so not in the course of selecting one interpretation of that term over another, but rather in holding that the ship's owner had not misrepresented the condition of the product insured. Id. at 583.

Nor does Wolf v. Superior Court, 114 Cal. App. 4th 1343 (2004), support DIRECTV's position. There, a dispute arose about the meaning of the term "gross receipts" in a contract between the creator of movie characters and a movie studio. Even putting aside that the court found the term "gross receipts" ambiguous, the court only adopted the definition customary in the motion picture industry because "both the nature of the contract and the circumstances involved the motion picture industry." Wolf, 114 Cal. App. 4th at 1357. Here, there is no analogous ambiguity or extrinsic evidence that Factory Mutual has any particular knowledge about the "electronics supply chain industry," or why any such knowledge would be particularly pertinent where DIRECTV is itself not a member of that industry in any capacity other than as an end customer.[1]

Absent any evidence that the parties intended "direct supplier" to have any technical, or industry-specific meaning, there is no reason to look beyond the ordinary meaning of the term. And without recourse to electronics supply industry jargon, any

---

[1] City Fuel Corp. v. National Fire Ins. Co. of Hartford, 446 Mass. 638 (2006), is also ultimately of little moment. Although the City Fuel court did state that "[a]n insurance policy is to be construed with reference to the customs of the trade or course of business respecting which it is issued," the court applied the ordinary meaning of the phrase "in the course of transit" as an objective purchaser would understand the term, without reference to any technical or transportation industry-specific usage.

definition of "direct supplier" to mean "customer-controlled component supplier" would not be reasonable. See Bay Cities, 5 Cal. 4th at 867 ("An insurance policy provision is ambiguous when it is capable of two or more constructions both of which are *reasonable.* Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists." (Internal quotations and citations omitted)).

Despite DIRECTV's Herculean efforts to stitch together various dictionary definitions of "direct" and "supplier," no ordinary and popular meaning of "direct supplier" could possibly encompass its relationship with Western Digital. DIRECTV, by its own admission, "does not receive components directly." (Opp. at 16:6-7.) It did not have any contract with Western Digital, never paid Western Digital anything, and never received any freestanding Western Digital hard drives. Western Digital hard drives only flowed to DIRECTV as a component part of STB's manufactured or refurbished by third parties with whom DIRECTV did have a contractual relationship. Indeed, DIRECTV acknowledges that STB manufacturers were free, at least initially, to select either Seagate or Western Digital hard drives. (Opp. at 5.) Although DIRECTV contends that it retained some power to instruct STB manufacturers to switch HDD suppliers, the fact that such intervention might have been necessary to ensure that DIRECTV received any STBs containing Western Digital products further underscores the indirect supply relationship between Western Digital and DIRECTV. Nor is DIRECTV's current attempt to characterize its direct, Tier 1 suppliers of STBs as "assemblers" rather than "manufacturers" meaningful or persuasive. Simply put, the ordinary meaning of "direct supplier"

does not apply to a situation where DIRECTV never received anything from Western Digital.

**IV. Conclusion**

For the reasons stated above, Defendant's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

Dated: February 1, 2016

                              DEAN D. PREGERSON
                       United States District Judge)